# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GABRIEL GREENIDGE** | : | |
| | : | |
| v. | : | **CIVIL ACTION NO. 20-6476** |
| | : | |
| **WELLPATH, LLC, et al.** | : | |

**McHUGH, J.**                                                                    **May 18, 2023**

### MEMORANDUM

This is a civil rights and medical negligence action arising out of care that Plaintiff Gabriel Greenidge received while he was incarcerated at the Pennsylvania Department of Corrections SCI-Phoenix facility.  Discovery is closed, all defendants have moved for summary judgment, and Plaintiff has not responded.  Reviewing his claims, I conclude that while Plaintiff rightly complains of some delays in his medical care, the deficits he identifies do not rise to the level of constitutional violations, and his state law negligence claims fail for lack of expert support.  Having carefully reviewed the record, I am persuaded that there are no material issues of fact and Defendants are entitled to judgment as a matter of law.  I am therefore constrained to grant the pending motions.

## I. Procedural History

Plaintiff commenced this action proceeding *pro se* but sought the assistance of the Court in obtaining counsel.  Counsel was appointed from the Court's panel of volunteer attorneys.  *See* ECF 34 & 35.  An Amended Complaint, ECF 37, and a Second Amended Complaint, ECF 46, followed, making the Second Amended Complaint the operative pleading at this stage in the litigation.  Counsel was later granted leave to withdraw, and deadlines were subsequently extended to allow Plaintiff to seek new counsel.  ECF 66.  Four months later, all Defendants moved for

summary judgment.  ECF 71, 72, & 73.  The motions were served and have been pending for five months without a response.  As such, they are now ripe for resolution.

## II.    Summary of Claims

The factual allegations in Plaintiff's Second Amended Complaint can be grouped into three broad categories:

1. He was allegedly denied bottom-bunk status, causing him to fall and injure himself;

2. The results of a CT scan, showing a kidney ailment and severe hydronephrosis, were allegedly not disclosed to Mr. Greenidge or treated adequately; and

3. That same scan showed a suspicious mass on his right kidney, later found to be cancerous, which was allegedly left undiagnosed and untreated for several months.

As to the correctional officers named, Sergeant Ettenger and Unit Manager Sellers, Plaintiff claims that he repeatedly requested a bottom-bunk assignment, but that he was consistently refused with dismissive comments.  Am. Compl. ¶¶ 17, 20-38.  The basis for the request was a prior automobile accident that injured Plaintiff's back.  The record reflects that, upon evaluation on April 11, 2019, CRNP DeFrangesco noted that Mr. Greenidge walked without difficulty and informed him that he did not currently meet the criteria for bottom-bunk status, but that he should follow up with the doctor.  DOC Medical Records 474-75, Ex. A to ECF 73.  One month later, on May 9, Mr. Greenidge saw Dr. Bainbridge, who concluded that further investigation was needed by way of an X-ray.  *Id.* at 469-71.  Upon receiving the X-ray report on May 30, Dr. Bainbridge found lumbar disc disease.  As a result, Dr. Bainbridge entered a medical order restricting Mr. Greenidge to a bottom bunk.  Inmate Medical Status Report, Ex. 4 to ECF 72.  That reclassification occurred on May 31 and, unfortunately, Mr. Greenidge fell the next day on June 1 while climbing down from his top bunk.  Am. Compl. ¶ 39.  He thus brings an Eighth

Amendment claim, citing Defendant-Officers' deliberate indifference to his request for a bottom-bunk assignment. *Id.* at ¶¶ 111-19.

With respect to Paoli Hospital, after his fall, Plaintiff was transported there and underwent CT imaging. *Id.* at ¶ 42. Plaintiff advances one count of professional negligence against Paoli, alleging that despite positive findings on the June 1 CT scan, his providers failed to order further urologic testing, evaluation, and/or treatment for Plaintiff's severe right-sided hydronephrosis, *id.* at ¶ 160, ultimately causing his right kidney to fail. *Id.* at ¶¶ 157-70.

As to Defendants Wellpath, a service providing medical care at the prison, and its professionals, including Dr. Wiener, Dr. Hanuschak, Dr. Bainbridge, and CRNP DeFrangesco, Plaintiff faults them for delay in treating his medical needs. Specifically, he alleges that he was provided delayed and improper medical treatment for his kidney issues while he was housed at SCI-Phoenix after several CT scans – the first of which was came from Paoli Hospital – revealed hydronephrosis of his right kidney and a suspicious mass. *Id.* at ¶¶ 53, 58-67, 69-72, 76-82, 101-10. The specific legal claims advanced against the Wellpath Defendants, set forth in Counts II and III of the Complaint, include: (1) deliberate indifference to a serious medical need in violation of the Eighth Amendment against Dr. Hanuschak, Dr. Bainbridge, Dr. Wiener, and CRNP DeFrangesco;[1] and (2) professional negligence against Wellpath, Dr. Hanuschak, Dr. Bainbridge, Dr. Wiener, and CRNP DeFrangesco. *Id.* at ¶¶ 120-56.

## III. Discussion

### A. DOC employees Ettenger and Sellers are entitled to summary judgment

Mr. Greenidge claims that Sergeant Ettenger and Unit Manager Sellers violated his Eighth Amendment rights when they denied his requests for a bottom-bunk assignment. Am. Compl. ¶¶

---

[1] Wellpath is not included within Plaintiff's Eighth Amendment claim against the individual doctors.

111-19.  Claims involving the failure to assign a proper bunk to accommodate an incarcerated person's medical needs are treated as conditions of confinement claims under the Eighth Amendment.  *See Andino-Hernandez v. Mason*, No. 3:21-1570, 2023 WL 2633217, at *5 (M.D. Pa. Mar. 24, 2023); *Cameron v. Swartz*, 2:17-CV-00816-AJS, 2020 WL 7496317, *5 (W.D. Pa. Nov. 19, 2020); *Cooper v. Wetzel*, No. 20-cv-04595, 2022 WL 2669167 (E.D. Pa. July 11, 2022) (Lloret, Mag. J.).  Because Defendants' conduct cannot be characterized as deliberately indifferent, I must grant their motion for summary judgment.

Prison officials violate the Eighth Amendment prohibition against cruel and unusual punishment when they act with deliberate indifference to a known and objectively serious risk to an incarcerated person's health or safety.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Beers-Capital v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001).  To prevail on this claim, Mr. Greenidge must show (1) a deprivation that is objectively and sufficiently serious and (2) that the defendants had a "sufficiently culpable state of mind," such that they acted with "deliberate indifference." *Farmer*, 511 U.S. at 834; *Hudson v. McMillian,* 503 U.S. 1, 8 (1992).  In this context, deliberate indifference is a subjective standard – "the prison official-defendant must actually have known or been aware of the excessive risk" to an individual's safety and disregarded it.  *Beers-Capitol*, 256 F.3d at 125; *see Farmer*, 511 U.S. at 842 (stating that "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm"); *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (describing deliberate indifference as a mindset requires "more than ordinary lack of due care for the [plaintiff's] interests or safety"); *Platt v. Brockenborough*, 476 F. Supp. 2d 467, 471 (E.D. Pa. 2007) (Brody, J.) (quoting *Farmer*, 511 U.S. at 835) (explaining that deliberate indifference requires something "more blameworthy than mere negligence").

In cases like this, courts have held that officers who are not on notice of a medical order for a bunk reassignment typically do not exhibit the requisite state of mind for deliberate indifference. *See, e.g., Harris v. Targot*, No. 3:16-cv-923, 2018 WL 4006786, at *6 (M.D. Pa. Aug. 22, 2018) (finding defendants not culpable when there was no "documentation indicating that plaintiff should be assigned on the bottom tier with a bottom bunk" and "the record reflect[ed] that medical staff at SCI-Camp Hill did not inform defendants . . . [about] the change in status"); *Price v. Williams,* No. 1:18-cv-583, 2020 WL 3172757, at *5 (M.D. Pa. June 15, 2020) (concluding that corrections officers did not act with deliberate indifference when they did not have a medical directive from medical staff for a bottom-tier bunk for the plaintiff, as "there [was] no evidence before the Court suggesting that [corrections officers] could unilaterally make the determination that such an accommodation was warranted").

Here, Plaintiff conceded at his deposition that he does not know whether Defendants Ettenger or Sellers knew of the May 31, 2019 medical order requiring that he obtain a bottom bunk prior to his fall the next day. *See* Greenidge Dep. 38:4-8, 39:20-42:8, 50:14-21, Ex. 1 to ECF 72. Indeed, Greenidge has little to no memory of *any* of the events leading up to his fall.  On the other hand, Sellers maintains that she did not have authority to accommodate a bottom-bunk request without a corresponding medical order, and that she did not know of any such order for Mr. Greenidge prior to his fall.  As stated above, the medical order granting Plaintiff a bottom bunk was not put in place until May 31, 2019, and Sellers states that she was unable to access that order in the prison's system on the same day that it was entered.  Sellers Decl. ¶ 4, Ex. 6 to ECF 72.  And while Greenidge does make some vague allegations about a correctional officer from the medical unit calling his block to report that he had obtained bottom-bunk status, he does not know who that officer spoke to or when that call occurred.  Greenidge Dep. 47:8-48:11, Ex. 1 to ECF 72; *see*

5

*Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 332-33 (3d Cir. 2005) (explaining that mere speculation cannot defeat a motion for summary judgment).  Consequently, Plaintiff can point to no evidence in the record to raise a material dispute regarding Defendants' knowledge of the medical order.

A claim of this type is more likely to succeed where correctional officers deliberately ignore a medical request for a bottom bunk that has long been in place.  *See Muhammad v. Dep't of Corr.*, 645 F. Supp. 2d 299, 317-18 (D.N.J. 2008), *aff'd*, 396 F. App'x 789 (3d Cir. 2010).  In *Muhammad*, the plaintiff, who had a leg amputation and used a prosthesis, had been assigned a lower bunk in an accessible cell in accordance with the prescription in his medical records.  *Id.* at 305.  Despite his protests, a defendant correctional officer transferred him to an upper-level bunk in a second-floor cell, where he experienced increased pain and was functionally unable to use the only accessible shower, "notwithstanding the fact that his lower bunk restriction was clearly indicated throughout his medical file."  *Id.* at 305-06 (cleaned up).  The court held that such evidence created a dispute of fact as to whether the defendant-officers were deliberately indifferent, *id.* at 315, emphasizing the officers' five-month delay in taking remedial action.  *Id.* at 317.

Unlike in *Muhammad*, Ettenger and Sellers did not intentionally move Plaintiff from his bottom-tier bunk to a top-tier bunk despite a "lower bunk restriction [that] was clearly indicated throughout his medical file."  *Id.* at 305-06.  Instead, Defendants here merely maintained the status quo, having seen no medical order instructing them to do otherwise.  Moreover, the medical order granting Greenidge a bottom bunk was entered less than 24 hours prior to Plaintiff's fall and, according to Defendants, was not yet accessible in the prison's online system.  Even if they had known of the order, mere failure to comply within 24 hours of its issuance would at most support

a finding of negligence, not deliberate indifference.  *Cf. id.* at 317 (finding deliberate indifference when it took defendants more than five months to accommodate Plaintiff's medically required bottom-bunk request).  Given the timing and the dearth of information regarding Ettenger and Seller's knowledge of the excessive risk to Plaintiff's health that the failure to assign him a bottom bunk would cause, Mr. Greenidge cannot survive summary judgment.

**B.  The claim against Paoli Hospital fails for lack of expert support**

In Pennsylvania, to state a prima facie cause of action for medical malpractice, a plaintiff must demonstrate the elements of negligence: "a duty owed by the physician to the patient, a breach of that duty by the physician, that the breach was the proximate cause of the harm suffered and the damages suffered were a direct result of harm."  *Hightower-Warren v. Silk,* 698 A.2d 52, 54 (Pa. 1997).  Expert testimony is not always required as to breach of duty because, under Pennsylvania law, a claim for malpractice can also be sustained under general principles of negligence.  *See Incollingo v. Ewing*, 282 A.2d 206 (Pa. 1971), *abrogated on other grounds by Kaczkowski v. Bolubasz,* 421 A.2d 1027 (Pa. 1980).  And under certain circumstances *res ipsa loquitur* applies. *Quinby v. Plumsteadville Fam. Prac., Inc.*, 907 A.2d 1061, 1070-73 (Pa. 2006). Nonetheless, "[w]ith all but the most self-evident medical malpractice actions there is also the added requirement that the plaintiff must provide a medical expert who will testify as to the elements of duty, breach, and causation."  *Id.* at 1070-71.

Here, even if one assumes that Plaintiff could argue a breach of duty employing general negligence issues – an issue on which I express no view – the issue of causation is medically complex.  Plaintiff's CT scan was taken on June 1, 2019.  By August 26, other physicians recognized the significance of the scan, which showed hydronephrosis, and set into motion a course of care that led to treatment.  Given the severity of the hydronephrosis observed, it is not self-evident that a delay of less than three months would have affected the outcome.  This is

particularly true where Mr. Greenidge links this finding to long-standing back pain, suggesting that it was likely a condition from which he had suffered for some time.  In the absence of expert testimony, a lay jury would not be equipped to determine whether such a delay was causally related to Plaintiff's loss of his kidney.  *See, e.g., Bearfield v. Hauch,* 595 A.2d 1320, 1322 (Pa. Super. Ct. 1991) (holding that, in the absence of a medical expert, the jury had no way to determine whether nerve damage during surgery was the result of negligence, or an "unavoidable consequence" of the surgery); *Gallegor by Gallegor v. Felder,* 478 A.2d 34, 37 (Pa. Super. Ct. 1984) (denying liability for nerve injury suffered during ear surgery due to complexity of the surgery and lack of expert testimony to link to nerve damage to improper technique).  I am therefore constrained to enter summary judgment in favor of Paoli Hospital.

### C.  The claims against the Wellpath Defendants fail to raise a material issue of fact

Plaintiff brings a constitutional and medical negligence claim against the Wellpath Defendants for their treatment of his hydronephrosis and kidney tumor, but neither can survive summary judgment.[2]

> i.  *Any deficits in Plaintiff's care for hydronephrosis do not rise to the level of deliberate indifference*

The CT scan that revealed hydronephrosis was taken when Mr. Greenidge was at Paoli Hospital following the fall from his bunk on June 1, 2019.  The discharge paperwork that accompanied him back to SCI-Phoenix after leaving Paoli reflected only his fall, a lumbar

---

[2] Mr. Greenidge does not appear to take issue with the Wellpath Defendants' assessment of his need for a bottom bunk, but in any event their conduct during the evaluation process can in no way be labeled as "indifferent."  As described above, the process followed by Dr. Bainbridge and CRNP DeFrangesco in determining whether Mr. Greenidge's medical needs required a lower bunk restriction was thorough and attentive.  Both individuals evaluated Mr. Greenidge, and after Dr. Bainbridge concluded from an X-ray that Greenidge suffered from lumbar disc disease, he entered a medical order for a bottom-bunk restriction – just one-and-a-half months after CRNP Defrangesco's initial evaluation.  Further, as to Defendants Hanuschak and Wiener, they are entitled to summary judgment on this issue because there is no record of their involvement in determining Mr. Greenidge's bunk status.  *See Evancho v. Fisher,* 423 F.3d 347, 353 (3d Cir. 2005).

contusion, and left knee sprain.  Paoli Hospital Records 56-64, Ex. C to ECF 73.  Because of those limited notes, following his return to SCI-Phoenix, medical staff did not become aware of the results of the June CT scan until Mr. Greenidge carried the printed scan that he received directly from Paoli to medical on or about August 26, 2019, as noted by Dr. Bainbridge.  DOC Medical Records 400-01, Ex. A to ECF 73.  Dr. Bainbridge then submitted a consult request for Mr. Greenidge to be seen by a urologist.  I have some concern over the delay in that visit, which did not occur until January 17, 2020.  *Id.* at 646.  But while awaiting that urology consult, Mr. Greenidge had to undergo a repeat CT scan of his abdomen, which occurred on November 22, 2019.  *Id.* at 667-68.  Updated lab studies were also performed in December before the urology visit.  *Id.* at 79-80.  In the interim, medical staff continued to be attentive to Mr. Greenidge's complaints and provided pain medication as necessary.  *Id.* at 362-65.  Even if one were to ascribe some degree of negligence to the lapse of time, looking at the totality of care, Mr. Greenidge was not ignored, and the record here falls well short of a finding of deliberate indifference.  *See Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (quoting *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987), *cert. denied* 486 U.S. 1006 (1988)) ("Mere disagreement as to the proper medical treatment is also insufficient.") (cleaned up).

      ii.    *Any deficits in Plaintiff's care with respect to the tumor identified do not rise to the level of deliberate indifference*

The same January 2020 CT scan that revealed Mr. Greenidge's hydronephrosis also noted the presence of a 1.3-centimeter lesion on Mr. Greenidge's kidney.  The record is unclear as to how or when this was reported to Wellpath but, as the physicians responsible for caring for

Plaintiff, they were certainly obligated to familiarize themselves with the records from the urology consult.[3]  Despite the January CT scan's results, no follow-up study was ordered, and on April 16, 2020, Plaintiff wrote to prison officials advising them that there was a mass that had not been further evaluated.  He ultimately filed a grievance in early June, which was deemed meritorious, and was seen in the infirmary, but the urology consult still did not occur until August.  An MRI performed at that time was interpreted as consistent with cancer.  DOC Medical Records 616-17, Ex. A to ECF 73.  Surgery followed on November 3, 2020.  *Id.* at 575-80.

The Wellpath defendants ignore the January CT scan and begin their narrative with the August MRI.  I view this as disingenuous.  A diagnosis of cancer was not confirmed until August, but certainly some further study was needed in response to the January CT findings.  The question is whether this delay rises to the level of deliberate indifference.  I take note that the Covid-19 pandemic emerged in late February 2020, with formal lockdowns commencing in mid-March; undoubtedly, the onset of the pandemic complicated consultations with physicians outside the institution.  I also note that this was not a situation where a diagnosis of cancer was yet confirmed.

It is also the case that the delay did not prevent successful surgery.  At his deposition, Mr. Greenidge testified that after his kidney removal, he did not require any further treatment.  Greenidge Dep. 120:8-12, Ex. F to ECF 73.   He further testified that the only follow-up care he needs at this point for his cancer is one yearly checkup for the next ten years.  *Id.* at 174:11-21.

In that regard, within the Third Circuit the law is not clear as to whether proof of harm is an element of an Eighth Amendment claim for inadequate healthcare.  This is so in part because courts tend to discuss the effects of any deficits in care when evaluating whether the medical need was sufficiently serious.  In *Brooks v. Kyler,* 204 F.3d 102, 105 n.4 (3d Cir. 2000), for example,

---

[3] Plaintiff pleads that Dr. Weiner confirmed that information during an Infirmary visit on January 20, 2020. Am. Compl. ¶ 104.

the Court of Appeals looked to the lack of harm as a relevant factor in rejecting an Eighth Amendment claim, observing that the plaintiff "presented no evidence of any harm resulting from a delay in medical treatment." *See also Lanzaro*, 834 F.2d at 347 ("The seriousness of an inmate's medical need may also be determined by reference to the effect of denying the particular treatment."). Considering this precedent and the background of the pandemic, even assuming that the delay in pursuing further study of the small lesion first seen in January 2020 can be deemed negligent, it does not rise to the level of a constitutional violation. Summary judgment is therefore warranted as to the Eighth Amendment claim.

iii.    *Plaintiff's state law professional liability claims fail for lack of expert support*

As with Plaintiff's malpractice claims against Paoli, even if a state-law theory of negligent delay could be advanced against the Wellpath Defendants without expert support, injury is a required element of a negligence claim under Pennsylvania law. *See Rizzo v. Haines*, 555 A.2d 58, 68 (Pa. 1989) (quoting *Schenkel v. Monheit*, 405 A.2d 493, 494 (Pa. Super. Ct. 1979) ("The mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm . . . does not suffice to create a cause of action for negligence."); *see also Kirby v. Carlisle*, 116 A.2d 220, 221 (Pa. 1955) ("Nominal damages to vindicate a technical right, cannot be recovered in a negligence action where no actual loss has occurred.").

Here, to establish injury from any negligent delays in diagnosis and treatment on Wellpath's part, Plaintiff would need expert testimony, because the medical issues are both subtle and complex. As to the delay in pursuing the hydronephrosis constituting injury, given its severity, it is not self-evident that a delay of less than three months would have affected the outcome for Mr. Greenidge. As to delayed diagnosis of the tumor, Plaintiff is presently cancer free. One potential consequence of delay in diagnosis might be that removal of his kidney was required. But only an expert could opine as to whether such an outcome would have been avoidable with earlier

surgery, especially given the presence of hydronephrosis.  Another potential consequence might be that Mr. Greenidge is at greater risk of future recurrence because of the delay, but once again that would require expert testimony.  *See Bearfield*, 595 A.2d at 1322.  Absent expert testimony, Plaintiff cannot prove injury, and as such fails to establish all the required elements of a negligence claim.  I am therefore constrained to grant summary judgment in favor of Defendants on Plaintiff's state law claims.

## IV.  Conclusion

For the reasons set forth above, Defendants' motions for summary judgment will be granted.  An appropriate order follows.

   /s/ Gerald Austin McHugh
United States District Judge